UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| PAUL PERKINS, Individually and on Behalf of a Class of all Persons Similarly Situated<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN NATIONAL INSURANCE COMPANY, a Foreign Corporation<br><br>Defendant. | CIVIL ACTION NO.: 3:05-CV-100 (CDL) |

## AFFIDAVIT OF JOSEPH R. RUSSO, JR.

Before me appeared Joseph R. Russo, Jr. and, upon his oath duly administered, stated the following:

1. My name is Joseph R. Russo, Jr. I am over 21 years of age, have never been convicted of a felony or crime involving moral turpitude, am otherwise competent to make this affidavit, and have personal knowledge of the facts stated in this affidavit.

2. I am attorney and a partner in the law firm Greer, Herz & Adams, L.L.P.

3. I am familiar with the issues in the class action styled *Perkins v. American National Insurance Company,* No. 3:05-CV-100 (CDL) pending in the United States District Court, Middle District of Georgia, Athens Division (the "Lawsuit"). Greer, Herz & Adams represents the defendant, American National Insurance Company ("American National"), in the Lawsuit.

4. I was actively involved in overseeing the collecting of information needed for resolving the dispute forming the basis of the Lawsuit. I have personal knowledge concerning most portions of American National's efforts to locate customer information for purposes of defining the class list.

5. It is my understanding that in May of 2007, American National began a five month internal document review campaign whereby the company reviewed its own documents to compile any information relating to the name, address, or personal information on the insured, the name, address of the dealership or insurance agency involved in the sale of the policy, and the name and address of the financial institutions that financed the loans covered by the credit or disability policy.

6. I also understand that American National requested files from outside agencies and reviewed those documents. The subject of the paperwork review included seeking records on 3.5 million policies. To complete the review timely, American National utilized approximately fifty people working forty-hour weeks between May of 2007 and October of 2007. When necessary, the staff worked weekends as well. Based on the number of people involved in the document-review project and the amount of time taken for the review, the document review likely required approximately 60,000 hours of work. American National paid all of the expenses of employing, training and officing these individuals.

7. In October of 2007, American National began sending letters directly to its dealerships and agents in connection with potential class members' credit and disability policies. The letters notified these companies that American National needed updated information on their lists of customers relating to their addresses, information on any termination date for underlying loans and the names of lenders involved in the credit transactions. American National identified

roughly 3200 dealerships and agents that received letters as a part of this phase of American National's information gathering efforts. At the same time, American National created a website to provide information to the dealerships and agents about the lawsuit and a webpage describing how to provide information to American National. The company also updated a website through which the dealerships and agents could provide requested information to American National electronically. American National also set up a phone bank and trained and utilized the staff from the record-review phase of the project to be available to answer phone calls from dealerships and agents if they had questions or needed assistance in providing information. American National's counsel sent a follow-up second letter to these dealership and agents in approximately November of 2007 again seeking the requested information. American National's counsel remained involved in the information-gathering process where the dealership or agency had a question that was legal in nature. American National's collection process from dealerships and agents formally continued approximately three months into March of 2008. American National continued to gather information from dealerships and lenders through July of 2008. Between October of 2007 and March of 2008, American National records reflect that the staff handled 1,852 incoming calls and placed over 1,700 outbound calls.

8. In March of 2008, American National completed the process of linking its policy lists to specific lenders and began sending subpoenas to lending institutions seeking information on its insureds and specifically seeking any termination dates for these customers. Because the numbers of policyholders were so large for certain lenders, American National created spreadsheets for the lenders to use to search their own information and set up a website specifically for the lenders to use to provide information back to American National. American National subpoenaed over 750 lenders involved with loans for approximately 717,000 policies.

3

American National, at American National's expense, also began seeking information on its customers through Accurint, a national personal information search firm, so that American National could provide the most current and accurate information to the lenders. American National allowed the lenders to access their website to provide information about the *Perkins* lawsuit and settlement. While it sought information from lenders, American National continued using twenty-five dedicated staff members to respond to lender phone calls into its phone banks. Records reflect that American National received over 2,900 phone calls and made over 3,000 outbound calls between April and July of 2008. Additionally, American National's attorneys dealt with the legal issues that arose as a result of the subpoena requests, including responding to objections and preparing motions to compel and any requisite protective orders. American National expended over $140,000.00 to reimburse lenders for expenses in searching the lender records.

9. In July of 2008 American National joined in an effort with an outside mailing company to mail over 900,000 letters directly to its insureds. Prior to sending any of these letters, American National sought and obtained updated name and address information from Accurint. Again, American National maintained a phone bank for phone inquiries made as a result of these letters. Additionally, American National maintained its staff to go through the paper responses received from any insured that provided information on their loan termination date. American National collected all of the information provided by their customers and compared it to the policy information within American National's database to determine whether or not the individual might be a Class Member. During the four months American National sought information from insureds, American National data shows the company received over 120,000 responses and received 37,000 phone calls related to the class settlement.

10. American National reviewed the data it received as a result of its pursuit and matched it with its own records to determine a final class list. The number of policies within the class was 94,415 and the total amount of refunds that would be due on these policies was $22,052,445.75 million. As of January 6, 2009, American National records show that the company had received and processed only nine requests to opt out of the settlement class and there were no objections.

11. The data collection to achieve the settlement alone took place over eighteen months. American National records show that the company incurred over $9,000,000.00 million in costs in gathering the data, and mailing the letters and notices to the parties.

_____
Joseph R. Russo, Jr.

SWORN and SUBSCRIBED to before me by Joseph R. Russo, Jr. on this 7th day of January, 2009.



Notary Public in and for the
State of Texas