Practising Law Institute
Corporate Law and Practice Course Handbook Series
PLI Order No. B0-00NC
April, 2000

Consumer Financial Services Litigation 2000

**\*811 CREDIT INSURANCE PREMIUM REFUNDS: A MULTI-MILLION DOLLAR CONSTRUCTIVE TRUST**

John Roddy
Edward O'Brien

Copyright (c) 2000, Practising Law Institute

### *813 Introduction

Credit insurance coverage is basically designed to pay the lender the remaining indebtedness if the borrower dies or becomes disabled while the loan is still outstanding. Credit insurance is a product that has been criticized by regulators and consumer advocates almost as long as it has existed. Despite regular and wide-ranging claims of overpricing and questionable sales methods, the credit insurance industry has thrived and its credit life, health, accident, disability, and unemployment insurance products represent a highly lucrative form of ancillary income for lenders. However, in recent years the threat of class action lawsuits, some increasingly strong rhetoric from regulators, and the attention of the media foreshadow a potential for a portion of credit insurance's traditionally high profits to be refunded to insureds. [FN1] The problem most often cited now is neither the value of the insurance, the exceedingly low loss ratios of the insurers, the methods of sale or the high commissions the lender agents reap from those sales. Rather, the issue in the forefront of credit insurance challenges is the failure to refund unearned prepaid premiums to insureds.

### The Problem

Certain lenders sell "single premium" credit insurance in conjunction with home mortgage loans. The term "single premium" **\*814** denotes a transaction where the entire premium is prepaid by the borrower/insured at the loan closing, where the premium is almost always deducted from the loan proceeds. The insurance is for a term of usually no more than 15 years, and the premium and the benefit are pegged to the loan amount. In this day and age, virtually all home mortgage loans are paid before maturity, most within the first 3-7 years. Where the loans are prepaid before the term of insurance has expired, the borrower is entitled to a refund of the unearned premium. The problem is, in some cases, and perhaps in many, many cases, no such refund is made.

If an insured loan is paid off but the borrower does not receive a refund of the unearned insurance premium, then: the lender retains the entire commission it earned on the sale of the product; the insurer retains the entire premium and keeps the coverage in force (with no risk of loss as the loan has been fully paid); and, in virtually all cases, the borrower is none the wiser, as borrowers are typically unaware that they are owed any refund. No one really knows the scope of the problem, but the issue of unrefunded premiums was of sufficient concern to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the National Association of Insurance Commissioners ("NAIC") that in NAIC's 1992 proceedings one subject of discussion was whether refunds were *ever* made was was the subject of discussion.

> The issue of whether premium ***815** refunds and death benefits in excess of the amount of the loan *are ever actually returned to the insureds* or their beneficiaries was discussed. Jean Carlson (Mich.) pointed out the need for strong market conduct reviews in order to assure that these moneys were paid to the appropriate parties.

1992 NAIC Proc. 10, 47. [Emphasis added].

The Federal Reserve Board recently analyzed the product and its problems. The Fed's report to Congress recommended a prohibition on credit insurance sales on high-cost mortgage loans. Mirroring the NAIC's concerns, the Fed's report noted that when loans with single premium credit insurance were paid before maturity "it is often difficult for consumers to get back the unused portion of their premium."[FN2]

Growing acknowledgement of the currency of this problem even as we begin the new millenium is evidenced by the recent action of the North Carolina General Assembly. North Carolina has enacted a new law, effective July 1, 2000 which is intended to address many abusive sub-prime lending practices. Among other things, this law prohibits the financing of prepaid single premium credit life, disability or unemployment insurance via the refinancing proceeds. Credit insurance may only be sold in North Carolina under this law pursuant to a **816** contract which requires monthly installment payment, and not a lump sum single payment, of the insurance premiums. One of the obvious abuses this provision of the law is intended to remedy is the widespread failure of insurers and their lender agents to refund the unearned portions of prepaid premiums when the insured loans are paid off before the term of the insurance has expired.

## The Historical Context

As alluded to above, the credit insurance industry generally carries a long history of questionable dealings. In 1955, a Congressional report known as the Langer Report (<u>Hearings before the Senate Subcommittee on Antitrust and Monopoly of the Senate, Commission on the Judiciary</u>, 83rd Cong., 2nd Session, Part 1, at 242) made known widespread abuse in the credit insurance field. After the Langer Report came three major congressional investigations of the industry. Senate Subcommittee on Antitrust and Monopoly Legislation of the Committee on the Judiciary, <u>The Tie-in Sale of Credit Insurance in Connection with Small Loans and Other Transactions</u>, 83rd Cong. 2nd Sess. (1955); Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary of the U.S. Senate, <u>The Consumer Credit Industry (Credit Insurance)</u>, 90th Cong., 1st Sess. (1967); **817** Subcommittee on Financial Institutions of the Committee on Banking and Currency of the U.S. Senate, <u>Hearings on S.1754 (Consumer Credit Insurance Act)</u>, 91st Cong., 1st Sess. (1969). Credit insurance abuses were more recently described in testimony before the House Committee on Banking and Financial Services, Hearings on H.R. 10 (Financial Services Competitiveness Act of 1997).

The specific abuse of keeping borrowers' unearned premiums has also been examined and discussed extensively by regulators, policymakers and other interested parties. The NAIC has expressly stated that it is the responsibility of the insurer to see that consumers get refunds of unearned premiums. In 1950, at the NAIC Eighty-first Annual Session, Quebec, Canada, the proceedings state that to avoid the problem of failing to refund unearned premiums.

> ... In case of pre-payment, the insurance company shall have unmistakable evidence in its files that the insured has received proper cash return or credit. In no case should an insurance company permit collection and retention of the return premium ... on the account of the purchaser or borrower. The amount of return premium due shall be shown on all cancellations.

Despite this clear mandate, the NAIC has documented a history of persistent **818** problems with "failure" to re-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

turn unearned premiums. At least 19 reports of the NAIC since 1945 have documented this specific abuse. For example, in 1969, one insurance commissioner wrote:

> ... in this case, there is also a "failure" on the part of the insurance company to refund the unearned premium after the transaction was paid off 22 months before expiration of the insurance. Of course, they are going to do it now, but had we not gotten into the picture, the insured probably would be out the money.

(Part of letter from Colorado Commissioner of Insurance to Nevada Commissioner of Insurance, reprinted in 1969 National Association of Insurance Commissioners Proceedings, Vol. II, p. 768-69.)

The abuses of the credit insurance industry are also noted in a number of other publications. 1955 Report of the National Association of Insurance Commissioners, A Background Study of the Regulation of Credit Life and Disability Insurance (1970); Note, Credit Insurance: Abuse and Reform, 10 B.C.Ind. and Comm.L.Rev. 439 (1969); Brobeck, Credit Life Insurance: The Nation's Biggest Insurance Ripoff, Consumer Federation of America (1990).[FN3]

In addition, the failure to return unearned premiums has been documented by three major congressional investigations of the **\*819** industry and other publications. Senate Subcommittee on Antitrust and Monopoly Legislation of the Committee on the Judiciary, The Tie-in Sale of Credit Insurance in Connection with Small Loans and Other Transactions, 83rd Cong. 2nd Sess. (1955); Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary of the U.S. Senate, The Consumer Credit Industry (Credit Insurance), 90th Cong., 1st Sess. (1967); Subcommittee on Financial Institutions of the Committee on Banking and Currency of the U.S. Senate, Hearings on S.1754 (Consumer Credit Insurance Act), (1969), 91st Cong. 1st Sess.; 1955 Report of the National Association of Insurance Commissioners, A Background Study of the Regulation of Credit Life and Disability Insurance (1970); Note, Credit Insurance: Abuse and Reform, 10 B.C.Ind. and Comm.L.Rev. 439 (1969); Brobeck, Credit Life Insurance: The Nation's Biggest Insurance Ripoff, Consumer Federation of America (1990).

The failure to return unearned premiums has also been the subject of numerous state regulatory bulletins, which are distributed to insurance companies regulated the states. E.g., Arizona, Circular Letters of the Department of insurance, Circular Letter of July 24, 1981; California, Insurance Department Bulletins, Bulletin NS-25; Florida Insurance Department Informational Bulletins, Informational Bulletin 91-16; Kansas, Insurance Department Bulletins, Bulletin No. 1991-16; Michigan, Insurance Bureau Bulletins, Bulletin **\*820** 85-9; Nebraska, Insurance Department Bulletins, Bulletin CB-18; North Carolina, Insurance Department Directives, Directive 88-3; Utah, Insurance Department Bulletins, Bulletin 82-11; Utah, Insurance Department Bulletins, Bulletin 79-4; Virginia, Bureau of Insurance Administrative Letters, Administrative Letter 1991-3; Virginia, Bureau of Insurance Administrative Letters, Administrative Letter 1983-2; and Washington, Insurance Department Bulletins, Bulletin No. 83-4.

**Beyond Context**

Given this context, it becomes clear that although the scope and nature of this problem have been identified by innumerable objective third parties, for reasons probably best ascribed to lack of investigative and enforcement resources, remedies for the problem have not been effectively devised or implemented. The most effective remedy therefore, would appear to lie in private attorneys general, either state or nationwide class actions seeking restitution, disgorgement and interest upon the monies held in this vast constructive trust.

How much money is so held is speculative at best, but when considering the long-standing, almost endemic nature of the problem in the industry, coupled with the dollar volume involved, the potential aggregate liabilities staggering. Each year, borrowers pay over $5 billion for credit **\*821** insurance. National Association of Insurance Commissioners ("NAIC"), 1997 Report on Credit Losses per state, 1994-1996. An estimated 60 million

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

consumer loans were covered by credit life insurance at the end of 1995. MarketFacts, <u>Consumers Choosing More Credit Life Insurance</u>, May 1, 1997, NILS Publishing Co. According to one source, as of the mid-1990s there was more than $500 billion of credit insurance in force on consumer loans, of which over $100 billion was applicable to mortgage loans. [FN4] Credit Insurance Newsletter, April, 1993 (CreditRe Corporation, Colleyville, TX). If a mere ten percent of this figure represents "phantom" in force coverage, i.e., unrecognized terminations from insured loan payoffs, then the credit insurance industry is holding over $1 billion in unearned premiums belonging to consumer insureds, and lenders are holding perhaps $500 million in unearned commissions. If this dormant problem is not appropriately handled it could turn into a financial and public relations debacle for lenders and insurers alike.

**Refunds Of Unearned Premiums Are Required By Law And Contract**

All states have enacted law designed to ensure that consumers charged for single premium credit insurance obtain refunds of their unearned premiums upon prepayment of their loans before the end of the term of the applicable insurance. The states require credit insurers to provide in their single premium insurance contracts that when loans are paid ***822** off early, a) the coverage shall automatically terminate; and b) the unearned premium shall be refunded. [FN5]

A typical credit insurance certificate will provide for automatic refunds upon loan payoff, with language like the following.

> **VOLUNTARY PREPAYMENT OF INDEBTEDNESS.** If you prepay the indebtedness other than as a result of death or through a lump sum disability payment, any credit insurance covering such indebtedness shall be terminated and you will receive an appropriate refund of the credit insurance premium.

"In practice, the refund is a part of the loan closing calculation and used to reduce the loan payoff amount." Fagg, G., <u>Credit Life and Disability Insurance</u>, p. 182 (CLICO Management, Inc., 1986). For example, if a borrower purchased seven years of term single premium credit life insurance and refinanced with a new loan within two years, the final payoff figure on the refinanced should be reduced by the unearned premium attributable to the five years of coverage the borrower never used. However, despite the clear requirements of law and contract, there are a number of reasons to believe that such refund calculations are not consistently made.

**Understanding the Market Forces That Created The Problem**

**\*823** *Vulnerable Borrowers And Aggressive Sales Practices*

Credit insurance is typically sold to borrowers with poor credit. Those with the poorest credit are relegated to dealing with the so-called "subprime" lenders who make loans to persons who cannot, or think they cannot, obtain loans from traditional institutional lenders. In 1998, the subprime mortgage market comprised over 10% of the overall mortgage market. Subprime mortgage volume exceeded $160 billion. Faulkner & Gray, <u>Home Equity Lending Directory, 1999 Edition</u>, pps. 1-1 - 1-3, Faulkner & Gray, Inc., New York, NY. Such persons are not "rate sensitive", nor are they likely to comparison shop for the best terms. Subprime borrowers tend to take credit where, on what terms, they can obtain it. As such, they are relatively easy targets for the sale of credit insurance in connection with their home mortgage loan transactions. Subprime mortgage lenders "offer" the single premium coverage by adding the charges to the pre-typed loan closing papers they present to borrowers at the low end of the credit market.

The industry itself acknowledges that credit life insurance has been characterized by coercive sales techniques. Jack Bobo, President of the National Association of Life Underwriters (NALU), reported to the broader insurance industry that "*credit life is ... often sold by coercion.*" <u>National Underwriter, Life and Health Edition</u>, July

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

8, 1994, op.ed.[Emphasis added]."[S]tudies have shown that ***824** [credit life insurance] is the worst form of consumer abuse. Consumers do not understand what they are purchasing (some do not even understand that they are purchasing it) and the price far exceeds what it would be in a 'competitive' market."Statement of the National Association of Life Underwriters and the National Association Professional Insurance Agents Before the Subcommittee on Commerce, Trade and Hazardous Materials, May 22, 1995, FDCH Congressional Testimony, May 22, 1995.

*Commission Profits*

Credit insurers maintain a stable of lender agents. The insurer assigns each of its mortgage lender agents a group policy number, under which it issues certificates of credit insurance coverage, by which the borrower is entitled to the benefits of the group policy. Lender agents which sell these ancillary products have a penetration rate (sales per loan) of more than 40%. ABA Banking Journal, September, 1996, Pg. 76, You've Got the Green Light, What's It Worth?, Ed Armstrong and Paul Buse.

For each sale, the insurer pays substantial commissions to its lender agents. Some insurers pay more in sales commissions than in death benefits. See, BestWeek, Credit Life, Credit A&H Net Premiums Rose in 1997, November 2, 1998; National Association of Insurance Commissioners, Credit Life and Accident and Health Insurance Loss Ratios for ***825** 1994-1996, December, 1997.

*Reverse Competition*

"The creditor typically chooses which insurer will provide coverage rather than the consumer. Consequently, insurers may compete for business by offering higher compensation to creditors."National Association of Insurance Commissioners, Issues, 1997: Credit Insurance, p. 46. The higher the percentage of premiums the credit insurer offers its lender-agents as commissions, the more economically attractive that insurer's products are to lenders. As commissions are computed as a percentage of the overall premium, the credit insurer who markets the *highest* priced insurance, and allows its agents to keep the highest percentages of the premiums charged, generally secures the greatest market share. Cope v. Aetna Fin. Co., 412 F.2d 635, 640 n. 14 (1st Cir. 1969) ("Reverse competition" is "a long-deplored feature of credit insurance transactions in many states.") "Reverse competition leads to certain abuses in the sale of credit insurance requiring stricter regulation than in most other [[[insurance] lines."National Association of Insurance Commissioners, Issues, 1997: Credit Insurance, p. 46.

In short, the market for the sale of credit insurance improves as the cost of the insurance increases. This is of course the opposite of traditional market economics, turning the notion of competition on its head. This ***826** anomaly occurs in part because the subprime borrower, as part of a "captive" market, can be induced by the lender to pay the highest possible cost for credit insurance because, as an ancillary product, its price in relation to the loan itself is not a material factor. It is the profit and not the cost which governs the negotiation for the purchase of the group policy by the lender. Therefore, any competition that may exist is among insurance companies in negotiating with lenders to make their product attractive, by offering lenders the greatest possible profit. In re Perry, 272 F. Supp. 73, 94 (Bankr. S.D. Me. 1967). This "reverse competition" results in a high premium rate for the consumer because he has no voice in determining rates, but obtains insurance only as an incident to the purchase of retail merchandise. Spears v. Colonial Bank of Alabama, 514 So. 2d 814, 819 (Ala. 1987).

To combat reverse competition, states cap commission levels at 40-50% of the single premium. Even so, competition is apparently intense enough to spur some insurers to flout state law commission ceilings in search of more lender-agents. See, e.g., The Insurance Regulator, March 30, 1998, p. 1 (reporting that Missouri Department of Insurance has levied its largest fine ever, on a large credit insurer it caught paying single premium credit insurance commissions to its agents of to 70% of gross premiums).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*A "System" Designed to Fail*

***827** The subprime mortgage market is exceedingly competitive, and for both lenders and servicers volume based lending and maintaining or improving market share is critical to survival. The securitized sale of mortgage instruments is also critical to economic survival and so virtually all insured loans are table-funded or originated with assignments in place. These loans are then often resold more than once before being paid off or subsumed into other portfolios because of mergers or business failures. But although armed with the knowledge that most subprime mortgage loans are sold at least once, and the vast majority are paid off within a few years of origination, shortsighted lenders and insurers fail to maintain a system whereby they can discern when loans are paid off and thereby provide the refunds to insureds which are required by law and contract. [FN6]

It could appear to the cynical observer that such lenders and insurers have deliberately failed to provide any mechanism for assuring that the unearned premiums would in fact be refunded and instead have maintained a system of doing business which resulted in their retention of significant amounts of unearned premiums. An insurer's failure to keep track of cancellations of its own coverages, or to simply establish practices for the effective communication of such information by and from its agents, is clearly contrary to credit insurance industry practices. "Lenders are required to maintain records of insureds covered under the group policy. ***828** Reports are provided to the insurance company of the new business issued and certificates refunded during the month."Fagg, G., Credit Life and Disability Insurance, supra, at 137.

The critical juncture is the mortgage loan payoff. The nature and descriptions of items on payoff statements are often cryptic or in industry jargon. In most cases, in fact, borrowers never see the payoff statements, and in those in which they do, the borrowers are not able to easily detect the fact that they are not receiving an appropriate credit for unearned insurance premiums upon prepayment of a loan. Most borrowers simply trust in the honesty and competence of the institutions with which they are transacting this business. They reasonably expect that if a refund is due (and experience indicates that most do not even know of their entitlement to a refund) that it will be made. Borrowers have no reason to comprehend that their payoff figures are wrong, overstated by the amount of the missing credit for the unearned premium refund.

In addition, borrowers most often have no ability to determine the accuracy of a payoff statement in any event. The calculations necessary to determine whether loan payoff figures are accurate are sophisticated and beyond the ability of virtually any layman. And with respect to credit insurance refunds, accurate calculations require knowledge of such matters as the formula for the "Rule of ***829** 78's", per diem calculations of "simple interest", whether and how prepaid real estate taxes, hazard insurance, and mortgage insurance escrows, if any, shall be accounted for, what portions of loan principal were not yet amortized on the mortgage loan, and the amounts, if any, due on account of accrued interest, late charges, authorized lender disbursements such as tax and insurance payments, prepayment penalties, and other amounts then claimed due and owing by the assignee to be paid off.

**How Much Coverage Is Phantom?**

*Mortgage Prepayment Expectancy And Coverage In Force*

Although subprime mortgage loans are generally written for 15 to 30 year terms, nearly all subprime mortgage loans are paid off early. Some are refinanced within a year, and the average subprime mortgage loan is paid off within two years. By the end of four years, more than 80% of subprime mortgage loans are paid off. National Mortgage News, Standard Prepayment Model Doesn't Fit Home Equity Securities, November 24, 1997, p. 20 (more than 25% of subprime mortgage loans are paid off within the first year; 20-30% of remaining loans are paid off each year thereafter); National Mortgage News, Subprime Mortgage Lending Comes of Age, December 29, 1997, p. 12 (predicting that more than 33% of 1996 subprime mortgage loans which are still open after their

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

first year will pay off in their second ***830** year).

If an insured's internal records show a wide discrepancy between the amount of inforce coverage and the expected termination rate of single premium product based on mortgage prepayment expectancy, it is likely that a significant portion of the difference is represented in phantom coverage. Other factors which tend to indicate phantom coverage include circumstances where credit insurance certificates remained in effect for longer periods than were expected; were automatically canceled for early loan payoffs less often; and had lower claims-per-policy rates as they aged. If such circumstances exist, a red liability flag may be waving in the air.

*Low Loss Ratios*

Insurers live on actuarial analyses, meant to measure risk in such a way as to allow an insurer to take only prudent risk in offering to safeguard its insureds. One measure of how well an insurer is performing its actuarial analyses is to look at its loss ratio on a particular product. The NAIC has concluded that a loss ratio of less than 60% shows the credit insurer's premiums are too high. "The [Credit Insurance] Committee has gathered clear evidence that the loss ratios associated with the credit insurance industry are grossly deficient [37%]. Our next step is to identify ... what regulatory steps need to be taken to protect the consumer". 1989 NAIC Proceedings, NAIC Winter National Meeting, ***831** Report of Commissioner Johnson, Chairman of the Committee on Credit Insurance. Accordingly, many states limit premiums by setting a target loss ratio of as much as 60% or more. Where an insurer's loss ratio is significantly below target loss ratios, the likelihood is that phantom coverage is at least partially responsible for the low number. "When a policy is canceled, the full original premium should be deducted from the total premium in force; otherwise, premiums in force ... would be overstated."Proceedings of the National Association of Insurance Commissioners, 1996-1 NAIC Proc. 407, 589.

**Conclusion**

Once an insured loan is paid off and the coverage automatically terminates, no claim can be filed against the coverage. A credit insurer which continues to draw unearned premiums into its revenue stream from thousands of loans which were paid off long ago (and which payoffs the insurer should reasonably recognize in the exercise of due diligence had to have occurred) is simply holding in an as yet unrecognized trust for insureds potentially large amounts of other people's money, with a number of good reasons to know that this money is wrongfully held.

[FN1]. See, e.g., Brobeck, Credit Life Insurance: The Nation's Biggest Insurance Ripoff, Consumer Federation of America (1990); NAIC Official Vows Study of Credit Insurance, Best's News, March 12, 1999; US Consumers Overpay for Credit Insurance, Reuters News Service, March 10, 1999; Beware Lenders Bearing Credit Insurance Policies Insurance News Network, March 7, 1999; Credit Insurers Again Attract State Scrutiny, The Wall Street Journal, February 3, 1999; Credit Life and Accidental Death Products Under Fire, American Banker, January 19, 1999, p. 11; Credit Life Under Fire for High Cost and Spotty Payout, National Underwriter, Life/Health Ed., March 3, 1997, p. 7; Just Say No to the Pitches for Credit Life Insurance, Money, February, 1997, p. 39; Credit Insurance Not Needed, Bad Deal for Many, Salt Lake City Tribune, January 31, 1997, p. 8; Study Assails Credit Life Insurance "Rip-Off", Knight-Ridder/Tribune Business News, January 30, 1997.

[FN2]. A September, 1998 Federal Reserve Board Bulletin (Volume 84, Federal Reserve Bulletin Number 9, p. 730) contains the full Statement by Edward M. Gramlich, Member, Board of Governors of the Federal Reserve System, before the U.S. Senate Subcommittee on Financial Institutions and Regulatory Relief and the Subcommittee on Housing Opportunity and Community Development of the Committee on Banking, Housing and Urban

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Affairs on July 17, 1998 and before the U.S. House of Representatives, Subcommittee on Financial Institutions and Consumer Credit and the Subcommittee on Housing and Community Opportunity of the Committee on Banking and Financial Services, on July 22, 1998.

[FN3]. See also, NAIC Official Vows Study of Credit Insurance, Best's News, March 12, 1999; US Consumers Overpay for Credit Insurance, Reuters News Service, March 10, 1999; Beware Lenders Bearing Credit Insurance Policies Insurance News Network, March 7, 1999, available at www.insure.com/personal/credit.html; Credit Insurers Again Attract State Scrutiny, The Wall Street Journal, February 3, 1999; Credit Life and Accidental Death Products Under Fire, American Banker, January 19, 1999, p. 11; Credit Life Under Fire for High Cost and Spotty Payout, National Underwriter, Life/Health Ed., March 3, 1997, p. 7; Just Say No to the Pitches for Credit Life Insurance, Money, February, 1997, p. 39; Credit Insurance Not Needed, Bad Deal for Many, Salt Lake City Tribune, January 31, 1997, p. 8; Study Assails Credit Life Insurance "Rip-Off", Knight-Ridder/Tribune Business News, January 30, 1997; NAIC Asked to Revisit Credit Insurance Model, National Underwriter, Property and Casualty Ed., p. 4; Jane Bryant Quinn, The Regulator's Boogie, Newsweek, October 3, 1994, Pg. 54; Steven Brostoff, Consumer Groups Contend Credit Life Still Costly, National Underwriter (Life/Health Edition), August 8, 1994, Pg. 5; David Ress, Credit Insurance Rate Cuts Sought, The Richmond Times Dispatch, July 13, 1994, Pg. 7; Mike Hudson, Credit Insurance: Overpriced and Oversold The New York Times, July 3, 1994, Pg. 8; L.H. Otis Regulators Clash on Credit Insurance Issues; Sheryl Nance, Insurance You Don't Need, Money, July, 1993, Pg. 78; Karen Riley, Credit Insurance Cost Called Industry's Most Overpriced, The Washington Times, December 15, 1992, Pg. 3; Credit Insurance Is Not as Good as it Sounds, Money, May 1992, Pg. 24; Lorraine Iannello, Washington State Probe Uncovers Abuses in Sale of Credit Insurance, Journal of Commerce (Five Star Ed.), February 5, 1992, Pg. 9A; Credit Insurance Loss Ratios Show Consumer Still Being Shortchanged, NAIC News, February, 1992, Pg. 1; Credit Insurance Report Shows Loss Ratios by State, 1987-89, National Association of Insurance Commissioners; NAIC News, February, 1991, Pg. 4; Robert Klein, Insurance at a Premium: the Hidden Costs of Credit Life, The Washington Post, January 18, 1991, Pg. 5; David Streitfeld; Credit Insurance Overhaul Sought, Richmond Times-Dispatch, January 4, 1991, Pg. 5; Estelle Jackson; Regulators Decry Credit Ins. Pricing, National Underwriter, Property and Casualty Edition, November 26, 1990, Pg. 19; Steven Brostoff, Looking Twice At Credit Insurance: High Premiums, Low Payouts May Make Other Coverage a Better Deal, The Washington Post, November 18, 1990; Albert B. Crenshaw, NAIC Begins Inquiry into Credit Insurance Business, The Executive Letter, November 12, 1990; Credit Insurance— A Bad Buy Gets Worse, Consumer Reports, October, 1990; Credit Life Insurance Curbs Sought: Commissioners' Group Will Seek to Control Profits, American Banker, June 19, 1990; David Isgur, State Checking Rates for Credit Insurance, Richmond Times-Dispatch, May 24, 1990, Pg. 1; Estelle Jackson, State Acts to Reduce Life and Health Coverage Premiums for Borrowers, Newark Star-Ledger, November 8, 1988, Pg. 18; Vincent R. Zarate, N.C. Moves to Reduce Credit Insurance Rates, The Journal of Commerce, May 6, 1987, Pg. 11A; Paula L. Green, Life Insurance to Live Without, U.S. News & World Report, December 22, 1986, Pg. 49; Patricia Scherschel, Car Dealers, Others Use New Ways to Push Costly Credit Insurance, The Wall Street Journal, November 14, 1985, Pg. 35; Walt Bogdanich, The Coercion Issue: It Won't Fade Away, Best's Review, November, 1985, Pg. 16; Dean Hilderbrandt, Jr.; Need Credit Insurance? Not on Your Life, Changing Times, March, 1985, Pg. 45; Jack Miller, A Heavier Cost Burden for Homebuyers, San Francisco Examiner, August 5, 1984, Pg. 1; Judge Bans Credit Firm's Sales Tactics National Underwriter. Property and Casualty Edition, March 2, 1984, Pg. 4. Samuel A. Rea, Jr., Arm-Breaking, Consumer Credit, and Personal Bankruptcy, 22 Econ. Inq. 88, 191-92 (1984); James H. Hunt, The Rule of 78: Hidden Penalty for Prepayment in Consumer Credit Transactions, 55 B.U.L. Rev. 331 (1975) (analyzing the workings of the "Rule of 78s," which is the method in which unearned premiums are refunded, in those instances in which they are indeed refunded); Gene A. Marsh, A Practitioner's

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Guide To The New Alabama Mini-Code, 48 Ala. L. Rev. 957, 1000 (1997) (same).

[FN4]. Credit insurance sold in connection with closed end credit transactions like mortgage loans is typically of the single premium variety, whereas credit insurance sold in connection with open end credit (credit cards, certain forms of home equity loans) purchases is usually based on a percentage of the oustanding amount and the premiums are imposed monthly.

[FN5]. See, for example, Cal Ins Code §779.14:
§ 779.14. Refunds; Right to rescind
  (a) Each individual policy, group certificate, or notice of proposed insurance shall provide that in the event of termination of the insurance prior to the scheduled maturity date of the indebtedness, any refund of an amount paid by the debtor for insurance shall be paid promptly to the person entitled thereto or credited to the next payment or payments due on the indebtedness....
Similarly, Chapter 31 of the Pennsylvania Insurance Code ("Credit Life Insurance and Credit Accident and Health Insurance") provides, in relevant part:
§ 73.31. Refunds.
  (a) Occurrence of refunds. Section 8(b) of the act (40 P. S. § 1007.8(b)) requires that each individual policy or group certificate shall provide that in the event of termination of the insurance prior to the scheduled maturity date of the indebtedness, any refund shall be paid or credited to the proper person.
    (1) All credit life insurance and credit accident and health insurance shall be terminated if the indebtedness is discharged due to prepayment, renewal, or refinancing prior to the scheduled maturity date.
    (2) Prepayment of the indebtedness by credit life insurance proceeds shall require a refund of any unearned accident and health credit insurance premium. The refund of the accident and health unearned premium shall be separate from and in addition to any credit life insurance proceeds.

[FN6]. On portfolioed loans the failure to refund unearned premiums does not appear to be a significant issue. As the loan is held "in-house" by the same lender agent which sold the policy, there is no explicable cause for any failure to refund the unearned premium.

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.