IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

PAUL PERKINS, Individually and on Behalf of a Class of Persons Similarly Situated, *

Plaintiffs, *

vs. * CASE NO. 3:05-CV-100 (CDL)

AMERICAN NATIONAL INSURANCE COMPANY, *

Defendant. *

O R D E R

After a reasonably diligent search for all class members in this action and the payment of full compensation to those class members who were identified, $3,609,485.24 remains to be distributed as part of the *cy pres* remainder fund in this certified class action settlement. Pursuant to the settlement agreement, the Remainder Fund Committee has made recommendations to the Court, which are adopted to the extent provided in this Order.[1] For the reasons and with the conditions described in the remainder of this Order, the Court finds that the following recipients shall share the *cy pres* remainder fund as follows:

[1] The Remainder Fund Committee consists of class counsel Joel O. Wooten, James E. Butler, Jr., Charles A. Gower, and Ben B. Philips. Order on Mot. for Creation of Remainder Fund 3, May 16, 2007, ECF No. 105.

1. $1,500,000.00 to the University of Georgia Foundation to be earmarked to the University of Georgia School of Law for the purpose of endowing a scholarship fund which shall be administered by a selection committee appointed by the Dean of the Law School to award financial assistance to deserving law students who have demonstrated an intention and commitment to dedicate a significant part of their professional legal career to the representation of individuals in civil matters who, due to their financial circumstances and the nature of their legal problem, would be unlikely to be able to privately retain legal counsel. This award contemplates that these scholarship recipients will include students who upon graduation will likely pursue employment opportunities with legal aid organizations and/or will likely engage in significant *pro bono* activities as an attorney.
2. $1,000,000.00 to the Mercer University School of Law to be earmarked for the purpose of endowing a scholarship fund which shall be administered by a selection committee appointed by the Dean of the Law School to award financial assistance to deserving law students who have demonstrated an intention and commitment to dedicate a significant part of their professional legal career to

the representation of individuals in civil matters who, due to their financial circumstances and the nature of their legal problem, would be unlikely to be able to privately retain legal counsel. This award contemplates that these scholarship recipients will include students who upon graduation will likely pursue employment opportunities with legal aid organizations and/or will likely engage in significant *pro bono* activities as an attorney.

3. $500,000.00 to the Community Foundation of the Chattahoochee Valley, Inc. to establish a fund for the charitable purpose of administering grants to national, regional and/or local organizations that would use the grants to educate and/or advocate for consumers who, due to their limited educational background and/or modest financial resources, are particularly susceptible to being victimized in consumer transactions.
4. $500,000.00 to the National Consumer Law Center, Inc.
5. $109,485.24 to The Georgia Legal Services Foundation.[2]

[2] The Court's intention is that The Georgia Legal Services Foundation shall receive the *cy pres* funds remaining after the grants to the University of Georgia Foundation, the Mercer University School of Law, the Community Foundation of the Chattahoochee Valley, Inc., and the National Consumer Law Center, Inc. have been made.

THE NATURE OF *CY PRES* DISTRIBUTIONS

Although judicial oversight and ultimate approval of *cy pres* distributions is well established, the process of a single judge awarding substantial funds that are produced by adversarial litigation to organizations which are not parties to that litigation presents challenges, both of substance and appearance, that are far removed from traditional Article III functions. Any attempt to meet those challenges must begin with an understanding of the legal principles that authorize *cy pres* distributions. The equitable *cy pres* doctrine has been adopted in the class action context, but it actually originated from the field of trusts and estates law:

> In trusts and estates law, cy pres, taken from the Norman French expression *cy pres comme possible* ("as near as possible"), save[s] testamentary gifts that otherwise would fail because their intended use is no longer possible. Courts permit the gift to be used for another purpose as close as possible to the gift's intended purpose. . . . In class actions, courts have approved creating cy pres funds, to be used for a charitable purpose related to the class plaintiffs' injury, when it is difficult for all class members to receive individual shares of the recovery and, as a result, some or all of the recovery remains.

*In re Lupron Mktg. & Sales Practices Litig.,* 677 F.3d 21, 30 (1st Cir. 2012) (alterations in original) (internal quotation marks omitted).

In evaluating a *cy pres* award, some courts have found the American Law Institute's Principles of the Law of Aggregate

Litigation ("ALI Principles") to provide helpful guidance. *See, e.g.*, *id.* at 32-33 (noting "[t]he ALI Principles set forth proposed rules for the use of a cy pres distribution in class action settlements" and outlining proposed policy preferences). These principles express a policy preference that unclaimed funds be redistributed to ensure that identified class members recover their full losses. *Id.* at 32. When identified class members have been fully compensated and remaining class members cannot reasonably be located, the ALI Principles establish the following order of preference:

> when feasible, the recipients should be those whose interests reasonably approximate those being pursued by the class[; and] [i]f no recipients whose interests reasonably approximate those being pursued by the class can be identified after thorough investigation and analysis, a court may approve a recipient that does not reasonably approximate the interests being pursued by the class.

*Id.* at 33 (internal quotation marks omitted). To determine whether a distribution "reasonably approximate[s] the interests of the class members," courts consider a number of factors which are not exclusive. *Id.* These factors include the underlying purposes of the law that provides the duty on which the cause of action is based, "the nature of the injury to the class members, the characteristics and interests of the class members, the geographical scope of the class, the reasons why the settlement

funds have gone unclaimed, and the closeness of the fit between the class and the cy pres recipient." *Id.*

Consistent with the foregoing principles, the Court in making the awards today has taken the following approach: (1) determine that a reasonably diligent effort has been made to locate class members who are the direct beneficiaries of the class action settlement; (2) assure that existing identified class members have been fully compensated; (3) have the attorneys who represented the parties in the action that produced the settlement fund present recommended recipients of the left-over *cy pres* funds; (4) scrutinize the recommendations to reasonably assure that the recipients are legitimate and established organizations with a track record demonstrating that they can accomplish the purpose of the distribution; and (5) approve distributions that will, as closely as reasonably possible, accomplish the purposes of the class action that produced the settlement remainder fund.

THE UNDERLYING LITIGATION AND THE *CY PRES* PROCESS

This class action was settled by the parties with a total of $22,054,881.31 to be paid directly to all identified class members and with any unclaimed funds being used to establish a *cy pres* remainder fund. Joint Addendum to Joint Mot. for Final Certification of a Settlement Class 2, ECF No. 146. The Court certified a settlement class and approved the class settlement.

The class is defined as Defendant's customers "who purchased single premium credit life and/or credit disability insurance . . . whose insured indebtedness was extinguished prior to its scheduled termination while the insurance was in effect[,] and . . . who [did] not receive[] a refund of any unearned premium." Final Order Certifying a Class for Settlement Purposes, Approving the Class Settlement, and Enjoining Prosecution of Released Claims 5-6, ECF No. 148. Pursuant to the settlement, the parties were required to conduct a search for all members of the settlement class. The Court found that such a search had been conducted. *Id.* at 5. The class included 94,409 members. Joint Addendum to Joint Mot. for Final Certification of a Settlement Class 1, ECF No. 146. Defendant sent checks directly to the identified members of the class based on the best information available to it. $3,639,957.91 of the $22,054,881.31 was unclaimed and paid into the registry of the Court. Subsequent efforts identified additional class members resulting in payments being made to those class members. *See* Order, July 9, 2010, ECF No. 160; Order, Jan. 12, 2012, ECF No. 163; Order, July 9, 2012, ECF No. 164. The Court is satisfied that reasonable efforts have been made to locate the class members, that any additional efforts would be futile, and that those identified and located class members have received 100% compensation for their unearned premiums. Notwithstanding a

reasonably diligent search designed to locate all class members, many class members could not be located, resulting in a remainder *cy pres* fund of $3,609,485.24.

In their settlement agreement, the parties agreed that such unclaimed funds should be awarded to tax-exempt charitable organizations for the purposes of advancing consumer awareness and consumer rights. The settlement agreement created a Remainder Fund Committee, consisting of the attorneys for the class, which would make recommendations for distributions to the Court. The Court would then accept, modify, or reject the recommendations. Order on Mot. for Creation of Remainder Fund 3, May 16, 2007, ECF No. 105.

The Remainder Fund Committee recommended awards to the University of Georgia Law School, the Mercer University Law School, The Community Foundation of the Chattahoochee Valley, Inc., The National Consumer Law Center, Inc., and The Georgia Legal Services Foundation. For the following reasons, the Court finds that awards to these recipients for the purposes specified herein are authorized and appropriate.

EVALUATION OF RECOMMENDATIONS

The Court finds that all reasonably identifiable class members have been fully compensated for their losses that form the basis for their claims in this class action. Therefore, the *cy pres* funds should not be redistributed to the existing

identifiable class members who have already been fully compensated. The next question is whether the recommended recipients are legitimate organizations which will administer the awards in a manner that will reasonably approximate the interests of the class. The Court finds that each proposed recipient has a reputation and track record for administering in a professional and ethical manner grants for charitable purposes similar to those that will be administered pursuant to the Court's awards. As explained more fully below, the Court further finds that the interests of those who will benefit from these awards, either directly or indirectly, reasonably approximate the interests of the class, and thus these awards represent the next best use of the funds.

The underlying class action vindicated a consumer's legal rights, particularly in transactions where there is unequal bargaining power. As the parties indicated in the settlement agreement, recipients of these funds should use them for the purposes of advancing consumer awareness and consumer rights. The Court finds that since the actual identifiable consumers who have specifically been harmed by the conduct alleged in the class action have been fully compensated, the next best recipients of the funds are (1)organizations that advocate for and/or educate consumers, and (2)organizations that train persons who will advocate for and educate consumers,

particularly regarding their rights in transactions where there is unequal bargaining power.

The Court finds that the Remainder Fund Committee's recommendations meet these criteria. The two law school grants and the grant to Georgia Legal Services are designed to educate and support lawyer advocates for consumers who would likely not otherwise find legal representation due to the nature of the claims and transactions. The Court finds that this use of the *cy pres* funds is particularly appropriate given the nature of the claims asserted in this class action. The most likely way individual consumers of modest means would be able to assert such claims, due to the small size of each individual claim, is in the class action context. The next best opportunity for an individual consumer of modest means to vindicate legal rights like those asserted in this action is through legal representation that is focused on the legitimacy of the claim and not on whether the individual claim is financially feasible to pursue. Attorneys who dedicate their professional lives to representing such individuals should be encouraged and supported in these worthwhile efforts. The grants to the law schools will allow some of those aspiring attorneys to graduate from law school with less debt, thus making their personal economic sacrifice less burdensome and at least partially eliminating one barrier to attracting lawyers to such worthy endeavors.

Similarly, the grant to Georgia Legal Services will support the activities of an organization that is focused on providing quality legal representation to low income individuals who otherwise could not afford an attorney to vindicate their legal rights.

The Court is also satisfied that The National Consumer Law Center's mission, reputation and established track record will ensure that it will be a good steward of the grant award made to it. It is a nonprofit advocacy organization that has sought to build economic security for economically disadvantaged individuals for over forty years by promoting access to quality financial services and protecting family assets from unfair and exploitive transactions. It focuses on all areas of consumer law, including car and insurance sales transactions. It has received good marks for accountability and transparency and is supported by a broad range of reputable funding sources.

Finally, the Community Foundation of the Chattahoochee Valley is in a unique position to administer a grant program for organizations that have as their mission advocating for and educating consumers regarding their legal rights and responsibilities, particularly as it relates to financial issues. The Court is aware of many programs that could use smaller grants to accomplish the purposes of the *cy pres* funding. Establishing an endowment fund that could provide a

source for funding such grants would allow the purposes of the *cy pres* funding to be accomplished in perpetuity. The Court is not well suited to administer such a grant program. The Court finds that the Community Foundation of the Chattahoochee Valley is uniquely positioned to play this role. It has expertise and experience in the grant making process. It knows how to vet applicants and has financial management experience to maximize the return on the endowed funds. While its home is within the jurisdiction of this Court, it has the capability of awarding grants to qualified applicants on a national scale. Being headquartered in close proximity to a large and significant military base (Ft. Benning) also gives it an opportunity to focus some of the funds toward programs that will help young soldiers who sometimes make poor financial consumer choices based on inexperience. The Community Foundation has significant resources and follows best management practices for similar foundations, making it a solid and stable recipient for such an award. The Court finds that by placing such a grant program under the auspices of such an organization and removing the Court from individual grant decisions, the program can be administered in the most efficient and effective manner to accomplish the purposes of the *cy pres* funding.

APPROVED DISTRIBUTIONS

Based on the foregoing, the Court approves the *cy pres* awards as follows:

1. University of Georgia Foundation, $1,500,000.00 (ear-marked for University of Georgia School of Law Scholarship Program described above);
2. The Mercer University School of Law, $1,000,000.00 (ear-marked for Law School Scholarship Program described above);
3. Community Foundation of the Chattahoochee Valley, Inc., $500,000.00 (designated for grant program described above);
4. National Consumer Law Center, Inc., $500,000.00;
5. The Georgia Legal Services Foundation, $109,485.24.[3]

Within fourteen days of today's Order, the Remainder Fund Committee shall notify the recipients of these awards, which notification shall include a copy of this Order. The recipients shall then within thirty days of receiving notification of the awards, notify the Remainder Fund Committee of their intention to accept the award and affirm that they understand the conditions of the award. They shall also notify the Remainder Fund Committee of any documentation that they customarily use to

---

[3] See *supra* note 2.

memorialize such grants and to ensure that the grant is used for the purposes specified in this Order. When the Remainder Fund Committee is satisfied that everything is in place to accomplish the purposes of the awards and the requirements of this Order, the Committee shall notify the Court, and the Court will then direct the Clerk to disburse the funds from the registry of the Court.

*OBITER*

The Court concludes this order with a few observations and a suggestion regarding the awards that establish the two law school scholarship funds. Our justice system, which enabled the pursuit and resolution of the present action, derives its ultimate authority from the consent of the governed. To maintain the trust necessary for the continued survival of this great system, those persons who are privileged to participate in it as members of the Bar have a solemn obligation to assure that it truly provides justice for all. A focused effort on identifying and supporting aspiring lawyers who desire to make a substantial contribution toward improving access to justice is both noble and necessary. To emphasize this aspect of the scholarships, the Court believes it important that the scholarships have a descriptive and distinctive name. Accordingly, the Court suggests that the two law schools consider including in the names of these scholarships the Latin

phrase, "*sic vos non vobis*," which translated means "thus ye labor, but not for yourselves." Each "Sic Vos Non Vobis Scholarship" recipient will thus be reminded by the name of the scholarship of why his or her law school education is being supported financially and will also have the opportunity to share with others who may be intrigued by the name, particularly lawyers, its meaning and significance.[4]

IT IS SO ORDERED, this 10th day of July, 2012.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE

[4] The phrase "sic vos non vobis" has its origins in a story told about the great Roman poet Virgil, who wrote during the reign of the first Roman emperor, Augustus, and is best known for his epic poem, the Aeneid. According to the story, Virgil anonymously wrote two lines of verse praising Augustus. When Augustus attempted to discover the author, another poet, Bathyllus, claimed it and was rewarded for it. Virgil objected and subsequently wrote verses including the phrase, "sic vos non vobis," which suggested not only that someone else had taken credit for his poem but that unselfish work is itself praiseworthy. Since that time, the Latin phrase has been used as a motto and referenced in classical works of literature. *See e.g.*, Thomas Carlyle, *Sartor Resartus* 235 n.3 (Charles Frederick Harrold, ed., The Odyssey Press, Inc., 16th prtg. 1979) (1937).